**SHELOR et ux. v. HUMBLE OIL & REFINING CO. et al.**

No. 4678.

Court of Civil Appeals of Texas. Amarillo.

Jan. 4, 1937.

Rehearing Denied Feb. 22, 1937.

A. D. Dyess and Joel W. Cook, both of Houston, for appellants.

John C. Townes, Cedric Taylor, H. P. Pressler, Jr., Lee M. Sharrar, R. E. Seagler, and Fulbright, Crooker & Freeman, all of Houston, for appellees.

HALL, Chief Justice.

J. W. Shelor and wife sued in trespass to try title to recover about ninety acres of land lying in Galveston county, and described in their pleadings, making E. E. Townes, S. C. Churchill, Humble Oil & Refining Company, State National Bank of Houston, and Federal Land Bank of Houston, defendants. The parties will be designated here as plaintiffs and defendants, respectively, as they were in the trial court.

In addition to the formal averments, the plaintiffs alleged that the land, as properly located on the ground, includes a strip 350 feet wide off the west side of a tract of land claimed and/or owned by the defendants out of the same survey, and which defendants had fenced with such other lands claimed and/or owned by them. In its final analysis this is a boundary suit. Schley v. Blum, 85 Tex. 551, 22 S.W. 667; McDonald et al. v. Humble Oil & Refining Co. (Tex.Civ. App.), 78 S.W.(2d) 1068, 1069, 1071.

By formal petition plaintiffs sought to recover damages in the sum of $15,000, alleged to be the value of oil produced from the land sued for and converted by the Humble Oil & Refining Company.

All defendants claim under E. E. Townes, and all pleaded the general issue. Townes and the Oil & Refining Company pleaded the three, five, ten, two, and four years' statutes of limitation. Townes, in the alternative (and only in the event of adverse judgment), prayed for reimbursement for improvements of the alleged value of $1,500 made by him in good faith.

By trial amendment the Oil & Refining Company alleged the drilling of an oil well in good faith at the cost of $56,820.25, which sum it was agreed by the parties to be correct. It was also stipulated during the trial that the oil produced from the well on the strip of land in controversy by the Oil & Refining Company prior to October 10, 1935, was of the value of $13,248.18.

The plaintiffs assert that the strip of land in controversy lies between a line marked by S. J. Maas, a surveyor, with two-inch iron pipes in 1913, said line being approximately 917.a feet east of the undisputed east line of the J. S. Sherman survey, at the point where such line marked by Maas intersects a county road crossing the B. B. B. & C. R. R. Company survey, and the line drawn parallel to and 1,390 feet, or possibly only 1,367.8 feet, east of the east line of the Sherman survey.

Plaintiffs contend that the strip in controversy is included within the boundaries of a tract of 340 acres, more or less, off of the west side of the B. B. B. & C. R. R. Company survey conveyed July 6, 1888, by one Joseph Franklin, the common source of title of all parties to the suit, to Edward Webster, Sr., under whom plaintiffs claim. Defendants insist that said strip is a part of a tract of 300 acres off the east side of said survey reserved and particularly excepted by the terms of said deed from its operation.

The trial court found that the east line of the B. B. B. & C. R. R. Company survey, as originally marked, would automatically, under the terms of plaintiffs' deed (which describes the land as that being conveyed by the deed from Franklin to Webster), fix the east line of their land at the point contended for by them.

In addition to the controversy as to the east line of the tract conveyed by Franklin to Gump, defendants contended: (1) That the present controversy had been determined by a previous judgment of the district court of Galveston county, and (2) that the line in dispute had been established at the same location as would be given it if all the facts recited in the judgment could be taken as true, and which location is the one contended for by defendants.

The judgment referred to was rendered in the case of J. F. Magale et al. v. Gulf City Trust Company et al., numbered 17282 on the docket of the district court of Galveston county.

The trial court sustained the defendants' contentions as to agreed boundary, acquiescence, and estoppel, and rendered judgment in favor of defendants. At the request of plaintiffs, the court filed findings of fact and conclusions of law, which were excepted to.

The strip of land in litigation lies wholly within the boundaries of the Buffalo Bayou, Brazos & Colorado Railroad survey, Patent No. 424, vol. 15, dated March 20, 1883, and will be referred to hereinafter as the B. B. B. & C. survey. This survey, as shown by the accompanying plat, lies between what is shown to be the Sherman and Jones surveys; and east of the Jones survey, as shown by the county map, lies the Edwards league:

notes for the Jones and the Martin (which is now the Sherman) surveys.

Plaintiffs' original petition describes the land sued for as follows: "Three Hundred and Forty acres (340) of land (more or less) taken off the west side of a tract granted by the State of Texas to the Buffalo Bayou, Brazos & Colorado Railroad Company by patent No. 424, Vol. 15, dated March 20, 1883, containing six hundred and forty acres (640) of land, situated on the north side of Dickinson Bayou in the County of Galveston, State of Texas, same being the same property described in deed from Joseph Franklin to Edward Webster, Sr., by special warranty deed dated July 6, 1888, and recorded in Vol. 68, page 488, of the Deed Records of Galveston County, Texas; and being the same property conveyed by Edward Webster, Sr., to E. J. Gump by general warranty deed dated March 23, 1892, recorded in Vol. 104, page 47, of the Deed Records of Galveston County, Texas."

The land claimed by Shelor and purchased by him is the western portion of said B. B. B. & C. survey, while the lands claimed by Townes et al. are the eastern portion of said survey and the Jones survey.

The B. B. B. & C. survey was originally surveyed in 1840 by Surveyor Banks for Wm. Garlick, but it was abandoned and no patent was ever issued by the state based upon his field notes. Later, in May, 1889, the tract was again surveyed for one Tarvin. No patent was issued upon the field notes of that survey. When the survey was made for Garlick by Banks, he also returned field

The petition in a boundary suit should describe the land by metes and bounds, and this should be done by each party, describing the lines by objects, if any, to be found on the ground. Where the description in the field notes is doubtful, and the objects called for cannot be found on the ground, the pleadings should accurately describe the land as the lines actually exist, and allege that such description is correct. Edwards v. Smith, 71 Tex. 156, 9 S.W. 77; Stephens v. Motl, 81 Tex. 115, 16 S.W. 731; Provident Nat. Bank v. Webb, 60 Tex.Civ. App. 321, 128 S.W. 426; Durden v. Roland (Tex.Civ.App.) 269 S.W. 274; Bailey v.

Baker (Tex.Civ.App.) 42 S.W. 124. But the question of the sufficiency of the pleadings is not urged here, and the defects are waived.

Accompanying the transcript we find more than fifty "exhibits." Some are referred to in the briefs. These exhibits consist of plats, maps, field notes by numerous surveyors, and photostatic copies of maps, field notes, with blueprints showing the lands involved, which also include much of the surrounding country and a part of the Gulf of Mexico; copies from the surveyor's offices, the General Land Office; copies of testimonios, patents, grants dating from the day of and signed by "Esteven F. Austin" to date, but most of them not signed by any one, with copies of deeds, letters, releases, dedication maps platted for sale by streets and blocks, as the map of North Galveston; these maps ranging in size from four inches square to four feet square. Most of them are indorsed with the number and style of this case and bearing its number as an exhibit and the name of the party introducing it, but none of them has been signed by either counsel or authenticated by the signature of the stenographer or the trial judge. Campbell v. Chapman (Tex.Civ.App.) 43 S.W.(2d) 315. Revised Statutes, art. 2239 (as amended by the Acts of the 42d Leg. 1st Called Sess. c. 34, p. 75 [Vernon's Ann. Civ.St. Art. 2239]), provides that such documents may, "by written direction of the judge, be sent up," but we find no such direction in the record, though there is an order on a large envelope that exhibits bearing certain numbers be sent. No part of any document has been copied into the statement of facts in connection with the witnesses' testimony. Continental Supply Co. v. Forrest E. Gilmore Co. (Tex.Civ. App.) 55 S.W.(2d) 622, 631. They are not attached to either of the three volumes of the statement of facts of over 600 pages, nor to each other. They are clearly not entitled to consideration. Payne v. City of Perryton (Tex.Civ.App.) 48 S.W.(2d) 497. But since the trial judge may have considered some of them, and no objection is made here upon the ground stated, and for the further reason that a few of them have been referred to in the six briefs and reply briefs, and replies to the reply briefs, ad infinitum, of the parties, we have decided to waive the insufficiency and defects and consider such of them as we can decipher if relevant. But it becomes necessary to add to the multitude of maps one of our own in order to make our holding clear.

The record shows that Joseph Franklin is the common source of title of all parties to the suit, and that he executed a conveyance dated July 6, 1888, to Edward Webster, Sr., under whom plaintiffs claim. This deed describes by metes and bounds 340 acres of land "more or less" off of the west side of a tract granted by the State of Texas to the B. B. B. & C. Railroad Company. It further appears that in said deed Franklin reserved 300 acres off the east side of said survey which is described as containing 640 acres; the purpose of the deed as expressed being to convey to Webster all of the 640 acres except the 300 acres reserved by Franklin off the east side. Later, through mesne conveyances, H. M. Trueheart acquired the west 200 acres of this 300 acres in October, 1890. Defendants claim under Trueheart. Gump acquired the west 340 acres of the B. B. B. & C. "more or less" from Webster on March 23, 1892.

The location of the dividing line between the land claimed by plaintiffs and that claimed by defendants, as decreed by the trial court, is shown by reading the following excerpt from the court's judgment in connection with the plat attached hereto:

"Being a line run by S. J. Maas in 1913 for E. J. Gump and in 1927 for J. W. Shelor, as the dividing line between the land on the B. B. B. & C. R. R. Co. Survey now owned by J. W. Shelor and the land on said survey now owned by E. E. Townes, and described as follows: Beginning on the north bank of Dickinson Bayou at a point which is 846.75 feet due East of the east line of the J. S. Sherman Survey; Thence north at 350 feet a ½″ iron pipe, and continuing north to and along the E. E. Townes west fence at 3,497.7 feet a 2″ iron pipe set by S. J. Maas on the south side of the San Leon-Dickinson public road, from which 2″ iron pipe another 2″ iron pipe set in the east line of the J. S. Sherman Survey on the south side of said public road bears South 79°46′ West 917.2 feet, and continuing north at 3,538.1 feet another 2″ iron pipe set by S. J. Maas on the north side of the San Leon-Dickinson public road, and continuing north along J. W. Shelor's east fence line, at 4,555 feet pass the northeast corner of J. W. Shelor's fenced enclosure, and continuing north through an open prairie, a total distance from the beginning point at 11,- 122.2 feet to a bed iron set by S. J. Maas

in the south boundary line of the Edward Payne Survey, said bed iron being 293.9 feet south and 1042.9 feet east of the northeast corner of the J. S. Sherman Survey as marked by a 4" iron pipe and an old cedar stake.

"The court is of the further opinion and so holds that plaintiffs are not entitled to recover of defendants any of the land on said survey lying east of the aforesaid division line, and that as to the land on said survey in controversy lying east of said division line, plaintiffs should take nothing."

That part of the survey lying east of said dividing line was decreed to defendants.

The Edwards league lying east of the lands involved in this suit is the oldest survey shown in the record. The league was granted to Amos Edwards in 1830, and lies on Galveston Bay and north of Dickinson's Bayou as shown on the plat. The field notes call to begin at Jack Davis Point at Red Fish Bar, and follow the shore line of Galveston Bay west 5,000 varas; thence south 60° west, 5,060 varas; thence south to Dickinson's Bayou; thence down said bayou to its mouth; and thence along the shore of the bay to the place of beginning. The boundaries of this survey seem to be definite and the corners well known. Its lines were located by a surveyor by the name of Ripley, in 1894, who marked the numerous corners with iron stakes. Some of these stakes were found by Surveyor Washington in 1934, and by appellees' surveyor, Brandt, in 1935. Both of these surveyors found that the corners fit the calls contained in the grant.

In 1840 when Surveyor Banks returned field notes for the John S. Jones, Wm. Garlick (now B. B. B. & C.), and H. B. Martin (now Sherman) surveys, covering lands north of Dickinson Bayou and west of the west line of the Edwards league, his Jones field notes called to begin at the southwest corner of the Edwards league where the league's west line touched Dickinson Bayou, and the field notes show that the Jones survey adjoined the 'west line of the Edwards league. The Garlick (B. B. B. & C.) called to begin on Dickinson's Bayou, 1,245 varas above the southwest corner of the Edwards league, and at the southwest corner of the Jones survey, and purported to cover land lying west of and adjoining the west line of the Jones.

The Martin (Sherman) called to begin at the southwest corner of the Garlick, and purported to cover land lying west of and adjoining the west line of the Garlick.

In 1849 Surveyor Banks resurveyed the Jones, and returned field notes thereon, and at the same time returned field notes of what had been the Garlick, which he designated as the Manuel Tarvin survey, which is now the B. B. B. & C. The Tarvin field notes were substantially identical with his field notes of the Garlick filed in 1840. At said time, 1849, Banks also returned field notes for the J. S. Sherman in place of the H. B. Martin. The resurveyed field notes of the Jones, upon which the patent was issued on May 2, 1849, called to begin at the southwest corner of the Edwards league on the north bank of Dickinson's Bayou, and to adjoin the west line of the Edwards league, and purported to cover land lying immediately west of and adjoining said league. The field notes of the Tarvin called to begin on the north side of the Dickinson Bayou, 1,245 varas above the southwest corner of the Edwards league, and at the southwest corner of the Jones, and purported to cover land lying west of and adjoining the west line of the Jones. No patent was issued upon the Tarvin field notes. The Sherman survey was patented May 3, 1849, on the Banks' field notes returned that same year.

After the Jones and Sherman were patented, the land lying between said surveys remained unappropriated until 1874, when J. V. Smith surveyed the same for the B. B. B. & C. Railroad Company, returning his field notes upon which the patent was issued in 1883. These field notes begin at a stake on the north side of Dickinson's Bayou, 1,245 varas above the southwest corner of the Edwards league, and at the southwest corner of the Jones survey, and purported to cover land lying immediately west of and adjoining the west line of the Jones. Field notes do not call for the Sherman.

Appellants' first proposition and appellees' third counter proposition call into question the effect of the judgment rendered on April 16, 1895, by the district court of Galveston county in cause No. 17282, in the case of Magale et al. v. Gulf City Trust Company, upon the docket of said court.

With reference to said judgment the appellants contend as follows: "The evidence showed, and the trial court found, that plaintiffs J. W. Shelor and wife held the superior record title to the strip of land in controversy. Defendants claimed under deeds

purporting to convey said strip to defendants. The evidence showed that the claims of defendants and their predecessors in title to the strip of land in controversy originated in a mistake as to the effect of a judgment rendered by the District Court of Galveston County, Texas, in cause No. 17,282, styled J. F. Magale, et al. vs. Gulf City Trust Company, et al., on the docket of said court. H. M. Trueheart, defendants' predecessor in title, with whom the mistake originated, believed that the effect of the judgment had been to divest Gump, the predecessor in title of the plaintiffs, of the title to the 90-acre strip. The primary question involved in this suit is whether or not said judgment had such effect. The suit is therefore not a boundary suit, but is really a suit to try title to the contested strip. The trial court's finding and conclusion that Shelor and wife are estopped to assert title to such strip is not supported by the evidence. Mere acquiescence or parol agreement by Gump, or his successors in title, the Shelors, would not operate to divest out of either of them the record title to such strip, in violation of the statute of frauds, and neither the trial court's finding of acquiescence by Gump and the Shelors in the mistaken belief of Trueheart as to the effect of said judgment, nor that of a parol agreement between Gump and Trueheart, nor both of such findings together, even if same were supported by the evidence, will support the judgment in favor of the defendants for the strip of land in controversy. The trial court, therefore, erred in rendering judgment in favor of the defendants and against plaintiffs for the land lying in the B. B. B. & C. R. R. Co. Survey, between the line marked by S. J. Maas in 1913 and the true east line of the 340-acre tract, described in the deed from Joseph Franklin to Edward Webster, Sr., of date July 6, 1888."

On the other hand, the appellees insist by their third counter proposition as follows: "The suit of Joseph F. Magale et al. v. Gulf City Trust Company et al., in the District Court of Galveston County, was a boundary suit and involved by the pleadings filed therein the issues as to the correct location on the ground of the Edwards league as surveyed and granted and the Jones and the B. B. B. & C. R. R. Co. surveys as surveyed and patented. E. J. Gump, appellants' predecessor in title, and H. M. Trueheart, appellees' predecessor in title, were parties to said suit, and were bound by the judgment rendered therein. The judgment rendered in said cause on April 16, 1895, established the boundary lines of the Edwards league in accordance with the field notes contained in the grant and as marked by H. C. Ripley in 1894, which lines and corners are now in existence and undisputed in this case. In said judgment the John S. Jones survey was established and fixed on the ground upon its patent field notes calling to begin at the southwest corner and for adjoinder with the west line of the Edwards league as established in said judgment. Said judgment also established on the ground the beginning or southeast corner of the B. B. B. & C. R. R. Co. survey as a common point with the southwest corner of the Jones survey, and at a distance of 1,245 varas up Dickinson Bayou from the southwest corner of the Edwards league as called for in the survey and patent field notes of the B. B. B. & C. R. R. Co. survey. Therefore, said judgment, having adjudicated and fixed on the ground the boundary lines of the Edwards league upon the field notes contained in the grant, and having adjudicated and fixed on the ground the boundary lines of the Jones as surveyed and patented as lying immediately west of and adjoining the west line of the Edwards league, and having adjudicated and fixed on the ground the beginning corner of the B. B. B. & C. R. R. Co. survey as surveyed and patented at a distance of 1,245 varas up Dickinson Bayou from the southwest corner of the Edwards League, necessarily fixed and established the east line of the B. B. B. & C. R. R. Co. survey as surveyed and patented as being coincident with the west line of the Jones as fixed in said judgment, and thereby adjudicated as against the predecessors in title of appellants and appellees the location on the ground of the 300 acres off the east side of the B. B. B. & C. R. R. Co. survey as reserved in the deed from Franklin to Webster dated July 13, 1888, and in legal effect pointed to the place on the ground for the boundary line between the east 300 acres reserved in said deed and the 340 acres, more or less, conveyed in said deed."

The findings of fact and conclusions of law filed by the trial court with reference to the judgment in the Magale case are in substance as follows:

"The object of the suit, as expressed in plaintiffs' original petition, was for the purpose of determining and establishing the location and boundary lines of the said east half of the Jones survey. * * *

"At the time of the institution of this suit, as well as at the time of final judgment

therein, the B. B. B. & C. survey was owned as follows: the east 100 acres of the east 300 acres by W. N. Bartlett, the west 200 acres of the east 300 acres by H. M. Trueheart, and the balance of the tract by E. J. Gump, to whom same had been conveyed by Webster on March 23, 1892, described as the same land deeded to Webster by Franklin by deed dated July 6, 1888. * * *

"The judgment recites that among other parties appearing came E. J. Gump and H. M. Trueheart, made parties defendant at the instance of the defendant Charles J. Blythin, and announced ready for trial. It also recites that W. N. Bartlett, who was made a party defendant also at the instance of the said Charles J. Blythin, not having been served with process of citation, was dismissed at the instance of the said Charles J. Blythin. * * *

"The judgment then proceeds to fix definitely and unequivocally the lines of the Amos Edwards league, and particularly its west line and its southwest and northwest corners as surveyed, marked and established by said H. C. Ripley, C. E., in June, 1894.

"The judgment goes further and definitely fixes the east and west lines as well as the other lines of the John S. Jones and also fixes the southeast corner of the B. B. B. & C. survey. In so fixing the lines of the Jones and the southeast corner of the B. B. B. & C., the court did not recognize a conflict between the Jones and Edwards, but by its judgment moved the entire Jones survey, as well as the southeast corner of the B. B. B. & C. and its east line, westward so as to give the Jones its full 640 acres with lines of the same length and direction as given by Banks. The judgment did not expressly attempt to fix the west line of the B. B. B. & C. Whether or not the judgment in the Magale suit went beyond the pleadings and the evidence in moving the entire Jones survey to the west, including the southeast corner and the east line of the B. B. B. & C. is of no consequence. It is, nevertheless, binding upon Gump and Trueheart, as well as those holding under them, under the rule that all parties to a law suit are bound by the final judgment therein. The fact that Bartlett owned the east 100 acres of the B. B. B. & C. and was dismissed from the suit can not be availed of by those holding under Gump and Trueheart. It is, nevertheless, a final judgment as to them. However, there is evidence in the record that Bartlett was privy to said judgment and

accepted and acquiesced in its holding, because in his deed of date May 26, 1896 to Charles J. Blythin, wherein he conveyed the south 50 acres of said east 100 acres, he accepted the southwest corner of the Edwards and the east line of the B. B. B. & C. as established in the Magale suit; and he did the same in the deed from Bartlett and wife to Cyrus H. Robinson.

"The court is of the opinion, however, that while Gump was a party to the Magale suit at the time of final judgment therein, his land on the west side of the B. B. B. & C. was not necessarily affected by the Magale judgment, because said judgment did not attempt expressly to fix the location of the west line of the B. B. B. & C. and the relocation of the east line of the B. B. B. & C. did not encroach on Gump's land, but I do find that the line fixed by the agreement between Gump and Trueheart as the division line between their tracts of land and found by this court to be the division line between the plaintiffs' and defendants' land, is the west line of the 300 acres lying immediately west of the east line of the B. B. B. & C. survey as fixed and established by the Magale judgment."

We think the trial court erred in holding that the effect of the Magale judgment was to move the entire Jones survey and the east line of the B. B. B. & C. to the west. The judgment fixes the northeast corner of the Edwards league at "Jack Davis Point where Red Fish Bar commences." This is a well-known point and its location on the ground is not questioned. The Jones field notes place it adjoining the Edwards on the west, and locates the B. B. B. & C. west of the Jones and adjoining it.

In the case of Thompson v. Langdon, 87 Tex. 254, 28 S.W. 931, 933, 935, Judge Gaines announced the rule that a survey must be established by the calls in its own field notes, and where there is no conflict in such calls, none may be created by extraneous evidence. He further held that the field notes of another surveyor, although made at the same time by the same surveyor, could not be used to create a conflict where none arises from the calls of the survey in question when the latter is applied to the objects called for as actually found on the ground. We quote: "The lines of a grant must be established by the calls in its field notes. If those calls are inconsistent, then certain

rules of construction and mere parol evidence may be resorted to in order to resolve the doubt and to establish the line which was actually run by the surveyor. It is but a case of a latent ambiguity in a written instrument. A writing unambiguous upon its face may become doubtful when applied to the subject-matter of the description. On the other hand, if there be no conflict in the calls found in the field notes of a survey, there is no room for construction, and the calls must speak for themselves. To permit the introduction of parol evidence to vary the calls would be to violate the familiar rule that extraneous evidence is not permissible to vary a written instrument. * * * But we apprehend that it is not proper to resort to the calls in the field notes of another survey, although made at the same time and by the same surveyor, to create a conflict in case none arises from the calls of the survey in question when applied to the objects called for as actually found on the ground. Survey No. 104 can be established by course and distance from its beginning corner without disregarding any call contained in it, and, in our opinion, it should be so established."

As we understand the Magale judgment, the east line of appellees' land is fixed by surveyors Maas, Hendsoldt, and Wilcoxson. The location of the line was fixed by beginning at the Davis Point Red Fish Bar corner of the Edwards league, which, as has been said, was well-known and marked by stakes, and from that corner laid off the Jones and the B. B. B. & C.

■ Many pages of the record and briefs of the parties are devoted to an analysis and interpretation of the Magale judgment, and an inquiry as to its effect upon the issue involved here. Suffice to say that it did not, in our opinion, locate or in any degree fix the line between the lands claimed by the parties to this suit, which premises were then owned by Gump and Trueheart. No issue on the location of said line was made by any pleading between them. There was no evidence as to any conflict between them. They were represented in that suit by the same lawyer, who filed a joint answer for them. This answer covers one sheet of legal cap paper. In addition to a plea of not guilty and a disclaimer as to any interest in any land other than that owned by them, they alleged as follows:

"The defendant, E. J. Gump, owns by fee simple title and estate 340 acres of land; and H. M. Trueheart, 200 acres of land by fee simple title and estate in the 640 acres of land in Galveston County, adjoining on the west the John S. Jones 640 acres in said county; that the red line on the map in plaintiffs' petition given as the west line of the said Jones survey is the east line of the said survey of 640 acres, wherein said defendants' land is situated; that the same was patented by the State of Texas to Edward Webster as assignee of the Buffalo Bayou, Brazos & Colorado Railroad Company by virtue of Certificate 17/195, Patent 424, Volume 15, and dated March 20, A.D. 1883, and issued by the State of Texas; that said survey is designated on the map or surveys in Galveston County as the B. B. B. & C. R. R. Co. That as to said land so owned by defendants in said survey, they say they are entitled to have lawful possession of the same, etc.

"It is further alleged that the boundary line of said B. B. B. & C. R. R. Co. survey of 640 acres in said County of Galveston within which their lands are situated are correct, legal, well established and clearly and well defined, and they pray that same may not be disturbed or in any respect changed, but that same may be recognized and preserved as valid and the rights of defendants therein secured and protected."

It is clear that no adverse claim was asserted by either of these parties as against the other, and even if the judgment had attempted to settle the location of the boundary line between their respective lands, it would have been void to that extent for the want of pleadings to support it.

However, if we are mistaken in this conclusion, the judgment must be affirmed upon other grounds stated in the court's findings of facts.

■ We approve the finding of the trial court that the line fixed by the agreement between Gump and Trueheart as the division line between their respective tracts of land is the west line of the 300 acres lying immediately west of the east line of the B. B. B. & C. survey as fixed and established by the Magale judgment.

The findings and conclusions of the court with reference to the agreed line separating the tracts claimed by Gump and Trueheart, respectively, are set out as follows:

"* * * that E. J. Gump and H. M. Trueheart, plaintiffs' and defendants' respective predecessors in title, shortly after the date of Magale judgment entered into a valid and legally binding agreement whereby the dividing line between their respective lands (the identical tracts involved here) was located and marked on the ground by a surveyor jointly employed by Gump and Trueheart for said purpose and that the location thus agreed upon is the location now contended for by defendants in this suit, which said agreement and location said Gump acquiesced in and never questioned from the making thereof to the time of his death in 1923.

"I also find that Plaintiff Shelor and wife, before their purchase of the land from Gump's heirs in 1927, knew, or, from facts communicated to them by Gump's attorney in fact, as well as by recitals in deeds of which they were charged with notice, should have known of said agreement and of the exact location on the ground of said agreed and marked boundary line.

"I further find that Plaintiff Shelor and wife purchased from the Gump heirs on the basis of and with written notice that the tract purchased by them contained only approximately 231.20 acres, and not 340 acres as believed by Gump to be the acreage before the agreement to fix the boundary was entered into and the survey pursuant thereto made.

"I further find that Shelor and wife accepted and acquiesced in the location of said dividing line as agreed by Gump and gave no indication that they questioned the location of said line as plainly marked on the ground, or of their intention not to be bound by said agreed line, until shortly prior to the filing of this suit in the Spring of 1935.

"I find that Defendant Townes, before purchasing his land, went upon the ground and located the dividing line as marked by the surveyor employed by Gump and Trueheart in 1895 and later surveyors, and in good faith believed said line was properly and correctly located, and with this belief puchased the land east of and up to said marked line.

"I, therefore, conclude that Shelor, by virtue of Gump's agreement aforesaid, as well as by his knowledge thereof at the time of his purchase and as well as by his own acts from the time of his acquisition of the land to the time of the filing of this suit, can not now question the location of said line, and that defendants are entitled to recover all land lying east of said agreed line.

"I further find that plaintiff, Shelor, subsequent to his purchase, had his east line staked out by a surveyor along the line contended for by the defendants, and erected a fence on a portion thereof north of the San Leon road, as a partition fence between his land and the land now owned by Townes, and that subsequently Townes had a surveyor mark on the ground south of the road the extension of said fence line, and built his partition fence thereon and built valuable improvements on what is now the disputed tract, relying upon said location of the division line made by Shelor, and that Shelor subsequently tied on to the Townes fence and reaffirmed and readopted it as the partition line between their properties; and I therefore conclude that the plaintiffs are estopped by reason of their acts subsequent to the purchase of their property in the B. B. B. & C. Survey to dispute the correctness of said fence as the true division line between the properties."

We think the testimony fully supports the court's finding that there was a valid and legally binding agreement between Trueheart and Gump with respect to their lands, which agreement was located and marked on the ground by a surveyor jointly employed by them for that purpose, and that that is the line now contended for by the defendants.

February 23, 1895, Gump wrote Trueheart & Co., inclosing the waiver of issuance and service of citation in the Magale suit, stating that he trusted Trueheart to incur as little expense as possible to protect their interests, and that they would share the costs as suggested in Trueheart's letter.

On May 9, 1895, Trueheart sent Gump a copy of the Magale judgment and a sketch showing the position of the Jones survey. He advised Gump that he was informed that the Jones survey was pushed over on the B. B. B. & C. survey to the extent of "gouging" about 150 acres out of the latter; that a survey would be necessary to determine the exact area. Trueheart asked Gump for $31.50 to pay his part of the attorney who represented them jointly, and called Gump's attention to the "more or less" clause in the deed from Franklin to Webster.

May 13, 1895, Gump answered Trueheart's letter, inclosing a check for attorney's fees, and on May 16 was notified that

the exchange had been received. In that letter one of Trueheart's office assistants suggested to Gump that because Trueheart owned an interest in the same survey which, however, did not seem to conflict, he thought it would be well for Gump to have his attorney to advise him on the chances of recovery, suggesting that the "more or less" clause might prove an obstacle.

June 17, 1895, Gump wrote Trueheart & Co. to have the land resurveyed as soon as possible to get at the shortage and fix corners and suggested that if Webster refused to make good the shortage to bring suit unless the "more or less" clause cut him out.

July 27, 1895, after the resurvey had been made, Gump was advised that the resurvey, after allowing the 100 acres and 200 acres off of the east side, left 231.2 acres. The expense of the survey was $18.98.

On July 30, 1895, Gump answered the foregoing letter of July 27th, and inclosed his deed from Webster and the decree of court, and requested that Trueheart try to get a settlement with Webster for Gump, but leaving the matter of filing suit to the best judgment of Trueheart. After some further correspondence, Trueheart & Co. wrote Gump that they had demanded of Webster that he make good his warranty on account of loss in acreage, but that several interviews were "all for naught."

October 1, 1895, Gump wrote Trueheart & Co., inclosing $102 for taxes, of which $18 was on account of "E. J. G." The letter had appended this postscript: "Please see if you can not get return of taxes paid on the land that is short."

December 3, 1897, Gump wrote Trueheart & Co. inclosing $17.42 for taxes, saying: "Please see they don't tax me for more than the 231.2 acres to which my B. B. B. tract has been scaled down. This tract is for sale. What is it worth? Can you get $20.00 per acre for it? See if you can find a buyer for it at something near this price."

April 30, 1898, John Adriance & Sons wrote Gump, advising him that Mr. Wilcoxson had made a resurvey of the B. B. B. & C. and "as soon as we can get his report will send it to you for your information." May 4th they sent the report, which showed that the land was unoccupied and not inclosed, and also inclosed bill for $30.25 as Gump's share of the surveyor's fee.

December 2, 1913, Adriance & Sons wrote Gump as follows: "As instructed by you November 7th, we have had your land in the B. B. B. & C. R. R. Co. survey on the north side of Dickinson Bayou resurveyed by Mr. Sam J. Maas, of this city, whose plat thereof (blue print), we hand you herewith, showing 77.42 acres south of the road and 175.14 acres north of the road, making a total of 252.56 acres, or an excess of 21.36 acres of land."

This letter explains that the delay was due to Maas' thoroughness in studying the court decrees affecting the lines of the B. B. B. & C., and calculating the acreage after deducting the 300 acres from the East side. They requested that he remit $60 as fees for Maas' survey.

December 18, 1913, Maas wrote Adriance & Sons, submitting a blueprint of the B. B. B. & C. survey, and returning field notes, papers, etc. He referred to Hendsoldt's survey of July, 1895, and explained how Maas did the work.

Gump died October 28, 1923.

In this connection the court found as follows:

"I also find that plaintiff Shelor and wife before their purchase of the land from Gump's heirs in 1927, knew or, from facts communicated to them by Gump's attorney in fact, as well as by recitals in deeds of which they were charged with notice, should have known of said agreement and of the exact location on the ground of said agreed and marked boundary line.

"I further find that plaintiff Shelor and wife purchased from the Gump heirs on the basis of and with written notice that the tract purchased by them contained only approximately 231.20 acres, and not 340 acres as believed by Gump to be the acreage before the agreement to fix the boundary was entered into and the survey pursuant thereto made.

"I further find that Shelor and wife accepted and acquiesced in the location of said dividing line as agreed to by Gump and gave no indication that they questioned the location of said line as plainly marked on the ground, or of their intention not to be bound by said agreed line, until shortly prior to the filing of this suit in the Spring of 1935.

"On October 27, 1926, and after E. J. Gump's death and after defendant Townes had purchased the land lying east of said agreed boundary line, in reliance upon said agreed line, and before plaintiffs purchased the Gump land, John A. Gump, heir of E. J. Gump, executed a power of attorney to one H. G. Porter, filed of record in Galveston County, Texas, January 20, 1927, in which he authorized Porter to sell all of his

interest in 231.20 acres of land, more or less, out of the west 340 acres of said survey.

"Shelor and wife purchased the land on February 8, 1927, from the Gump heirs, through said Porter as attorney in fact. Shelor purchased through W. H. Dick, a real estate agent of Houston, Texas, who testified in this cause. On December 11, 1926, Porter wrote Dick, 'Mr. Gump tells me the tract was 340 acres at time of purchase, but last survey showed 232 acres.' Dick testified, and his testimony was uncontradicted by Shelor, that he advised Mr. Shelor of this fact, and that the parties were dickering on the basis of 232 acres at a price of $20.00 per acre, which amounted to $4640.00, and that Mr. Shelor then offered $4500.00 flat, which was finally accepted. I, therefore, find and conclude that Mr. Shelor had actual knowledge as well as notice, with which he was charged as a matter of law, of the agreement theretofore made between Gump and Trueheart, and I also find as a fact that Shelor purchased on the basis of 232 acres. This finding is bourne out, the trial court thinks, by the fact that J. W. Shelor, in his mineral deed of date November 14, 1931, to Mrs. Alice Lynn Shelor, makes the following statement: 'While deed into lessor recites 340 acres, more or less, lessor advises actual survey shows only 250 acres, which figure is accepted by lessor and lessee as rental paying basis under this lease.'

"As further evidence of Shelor's knowledge of the agreed boundary and of his acquiescence therein, the evidence shows, and the court so finds, that not long before the filing of this suit certain hay men permitted by Townes to cut hay on his land north of the road got over on Shelor's land north and west of the east line of said 20 acres, and that Mr. Shelor came upon the land and reprimanded them and stated to these men that the fence marked his line, and that they must not intrude upon his land."

The record shows that Shelor purchased the land from Gump's heirs February 8, 1927, through H. G. Porter, an attorney in fact for the heirs. Ratification deed was made by John A. Gump February 5, 1934. November 14, 1931, Shelor sold his wife an undivided one-half mineral interest in the tract which he had purchased from the Gumps. W. H. Dick, a real estate agent, testified that he had the Gump land listed with him for sale in the fall and winter of 1926-27, and negotiated with Gump through Porter; that Shelor put up $100 as earnest money on the purchase; that the negotiations were based upon the probable acreage of 231 and a fraction, and the Gumps wanted $20 per acre for it. Based on an acreage of .232, Shelor authorized Dick to make Porter and the Gumps a flat offer of $4,500, which they finally accepted. Dick and Shelor visited the land, and Shelor and a surveyor named Durst went down to the Galveston county courthouse and got some records, and the three men went up there and located the land.

The power of attorney which Gump gave Porter, dated October 27, 1926, describes the land as follows: "231.21 acres of land, more or less, out of the West (340) Three Hundred and forty acres of B. B. B. & C. Railway Company Survey, situated on Dickinsons Bayou in Galveston County Texas and being that particular property in said survey owned by said John A. Gump."

A grazing lease from Adriance & Sons, as agents, to one McFadden was introduced, which described the land in question as 254 acres.

In the mineral deed which Shelor made his wife on November 14, 1931, the land is described as follows: " * * * while deed into lessor recites 340 acres, more or less, lessor advises actual survey shows only 250 acres, which figure is accepted by lessor and lessee as rental paying basis under this lease."

In a deed of trust, dated March 16, 1932, from Shelor and wife to George P. Snyder, trustee, the fact is referred to that an actual survey of their property in the B. B. B. & C. tract showed that it contained only 250 acres.

Shelor, in leasing his land for oil and gas to L. H. Murray, November 20, 1929, stated: "While deed into lessor recites 340 acres, more or less, lessor advises actual survey shows only 250 acres."

Shelor did not contradict the testimony of W. H. Dick concerning Shelor's purchase of the land on a basis of 232 acres, or his testimony with regard to Shelor's investigation of the records of Galveston county prior to the purchase of said land by Shelor.

The court further found as follows:

"I further find that Shelor and wife accepted and acquiesced in the location of said dividing line as agreed to by Gump, and gave no indication that they questioned the location of said line as plainly mark-

ed on the ground, or of their intention not to be bound by said agreed line, until shortly prior to the filing of this suit in the Spring of 1935.

"After Mr. Shelor acquired the land he employed a surveyor by the name of Durst out of Houston to resurvey his land, but the evidence does not show the result of Durst's work. Mr. Shelor's farm superintendent testified Mr. Shelor was not satisfied with Durst's work and thereafter Shelor employed Surveyor S. J. Maas to check the line again and recheck the acreage. Maas located the line and the markers thereof at the same place as he did in his survey in 1913 and again so advised Mr. Shelor and furnished him a map of his work. In the meantime the land in question had been split north and south by a public road. Thereafter, and before Townes made any improvements upon his land, Shelor fenced a 20-acre patch north of said road and built the east line fence along the division line agreed upon between Gump and Trueheart and as established and marked on the ground by Surveyors Hendsoldt and Wilcoxson and twice by Maas. Thereafter, Townes, with Shelor's full knowledge and without complaint, and in reliance among other things on said fence line as fixed by Shelor and the division line as designated by such fence, erected a division fence from the road to the bayou between his and Shelor's land, placing said fence on a line with the east line of Shelor's fence on the north of the road and on the line agreed upon between Gump and Trueheart and fixed by the several surveyors. Thereafter, in reliance upon the boundary line as thus marked, and upon Shelor's acts in so marking same, Mr. Townes, with Mr. Shelor's full knowledge and without complaint, erected a dwelling house and barns upon the disputed strip. These improvements were also erected in reliance, among other things, upon the division fence first built by Shelor as aforesaid, and in reliance upon Shelor's acquiescence in such division line."

This suit was filed April 30, 1935.

A. L. Short, Shelor's farm manager, testified that after Shelor and Durst had obtained some records from the Galveston county courthouse, they went out and located the land at the time of Shelor's purchase, and that a few days later Shelor wired the surveyor, Maas, to resurvey the land. Short was ordered to help Maas, and went over the ground with him, Maas telling Short that he had surveyed the land once before. Short drove stakes for Maas on the line established by the latter, and subsequently built a fence for Shelor on that line. Short testified that it was the line about the middle of the B. B. B. & C. survey which Maas had surveyed off from the east side. Short erected a four-wire fence, which was there on the land when he went back to it a year later. The fence was on the east side of the 20 acre tract north of the road. ·

Maas testified that he surveyed the Gump land at the request of Adriance & Co. in 1913; that he made the survey on the ground and returned a plot of his work; that according to his calculation, the Gump acreage was 77.42 acres south of the San Leon public road, and 175.14 acres north of said road; that he placed two 2-inch iron pipes as markers of the east line of the Gump tract, one marker being on the north side of the road, and one on the south side of the road. He also stated that Mr. Hendsoldt, referred to in his letter of December 18, 1913, was an old surveyor operating in Galveston and Harris counties; that in making the survey in 1913 Maas had before him the judgment in the Magale suit, and the file notes description contained in the deed from Webster to Gump; that he found the four-inch pipe set by Major Ripley in 1894 and tied into the west line of the Edwards league as fixed by the Magale judgment; that the west line of the Edwards was generally accepted by surveyors in Galveston county as being at the place where the Magale judgment fixed it; that Adriance & Co., as the agents of Gump, paid him for his work.

In 1927 Maas did further surveying on this land at the request of Shelor. Shelor's letter stated: "This section seems to be a short section, and I am sure that you can straighten it out and give me the exact acreage." It appears from the letter that Shelor was contemplating making a sale of a part of the tract. Maas went on the land, made a plot for Shelor, using the same field notes he had used in making the former plot for Gump, with the same east line of the Shelor tract as for the Gump tract. In making his survey Maas laid off 100 acres on the east side of the B. B. B. & C., and then an additional 200 acres just west of the 100 acres, and threw into the Shelor tract such other land as was in the B. B. B. & C. survey to the west of the west line of the 200-acre tract.

Witness Strom testified that Shelor built a fence north of the public road on the east line run by Mr. Shelor's surveyor about February, 1927, right after Shelor bought the land.

Witness Mancuso testified that when he was cutting hay there in July, 1934, Shelor identified the fence on the east line of the 20-acre tract north of the road as his east line.

Witness Churchill testified to the same fact, Shelor saying at that time that that was the line between his land and Townes'.

Shelor's fence north of the road was built about two years before Townes' improvements were put on the land south of the road. The Townes fence south of the road was built as an extension of the Shelor fence, and in line with the stakes on the north and south sides of the road, being built in April or May, 1930, and prior to the construction of any improvements on the Townes property. In that year Shelor built a fence along the north line of the portion of his tract lying south of the road, and tied such fence on to the fence built by Townes along the west line of his tract.

In 1930 Townes dug a water well 275 feet south of the road, and east of his west line, and built a barn about 200 feet east of the west line and 200 feet south of the San Leon public road, at an approximate aggregate cost of $953. He also built a one-story frame house, weather-boarded, sealed with shiplap, about 225 feet east of his west line, at a cost of about $1,500; that in erecting these improvements he knew nothing of Shelor's claim to the strip in controversy. He testified that he relied on the stakes north and south of the San Leon road in making his improvements, just as he had relied on that line in purchasing the property in the B. B. B. & C. survey. The first barn was burned and the second barn was built in the fall of 1934 by Townes. The witness Churchill testified that Shelor visited the property at least twice while the new barn was being built in the fall of 1934 and congratulated witness on building a good barn, but raised no objection to its location at that time.

Witnesses Mancuso and Churchill testified that in July, 1934, they were cutting hay north of the San Leon road on the Townes side of the fence to Shelor's 20-acre tract. That they were cutting northward from the road and passed the north end of the Shelor fence where there was a tract of about three acres. That Shelor came over and stopped them from mowing and said it was all right to cut that three acres, but told them not to cut over his line which ran from the corner of the fence straight out to a beacon in the field, which is located due north from the Shelor line, telling them that the fence on the east side of the twenty acres tract was his line and was Townes' line.

The Texas decisions hold that where the location of the boundary line between two adjoining tracts is unknown and there is uncertainty or dispute as to its location, the boundary line may be established by oral agreement between the respective owners, and that such agreement is not void under the statute of frauds, and it matters not whether the true line be easy or difficult of ascertainment, if it had not been fixed or marked on the ground, and the respective owners adopted the method of agreement in order to locate it. It is further settled that the fact that such boundary line so established proved to be not the true boundary line, and the further fact that such agreement does not correctly locate the boundary line, and that the parties to the agreement were mistaken as to its correct location, does not affect the validity of the oral agreement establishing such boundary line, and the parties will be held to the line agreed upon.

There is no word of proof that the boundary line between Trueheart's tract and the Gump tract was ever marked or designated on the ground, or that it was fixed by natural objects on the ground, or that its location was in any way identified or known to Trueheart and Gump prior to the date of the survey made by Hendsoldt, who was employed jointly by Trueheart and Gump for the purpose of fixing that boundary line.

In the early case of Coleman v. Smith, 55 Tex. 254, 261, the Supreme Court said: "We believe, however, that the more equitable rule is that which has been followed with us; and that where neighbors are in doubt about their boundaries, and both are ignorant of where they are, and, their lines have become obliterated by time, and, for the purpose of settling and adjusting them, they in good faith establish divisional lines between them, and these lines are acted upon and acquiesced in even for a period within the statute of limitations, such agreements ought to be upheld and enforced. It has often been decided that they are not within the statute of frauds."

A leading case applicable to the instant case is Harn v. Smith, 79 Tex. 310, 15 S.W. 240, 241, 23 Am.St.Rep. 340, in which it is said:

" * * * because the proof shows that the true line was easy of ascertainment, and that the agreement upon a line was a mutual mistake, both parties believing it to be the true divisional line, and because there was no consideration for the establishment of a line depriving plaintiff or his vendors of their land, because there were no acts of plaintiff or his vendors in regard to a division line to the injury of defendant. * * *

"It was proven at that time the lines of the 10 acres and other surveys adjoining, made by Scott in subdivisions of 100 acres, of which the 10 acres were a part, were in confusion, and Herring and Robert Smith determined to divide the 10 acres; they assumed as the north-west corner of the 10 acres a stake in the upper northern limit of the western fence, which Robert Wilson had before pointed out to Herring, in making a survey of his subdivision of 100 acres adjoining the 10 acres, as the north-west corner of the 10 acres; and chained down the western fence one-half the distance called for in the field-notes of the 10 acres, and then chained and staked off the distance called for across the 10 acres. Upon this cross-line a staked and ridered fence was built by Herring by agreement of defendant's husband that it should be a division line between them of the 10 acres. Defendant had knowledge of the building of the fence, has ever since regarded it, and both Herring and defendant thought it was, the true divisional line. This line was some 30 or 40 feet above or north-west of the line as actually now ascertained to be the true line, as shown by recent survey, and such line could have been ascertained with accuracy from the well-established south line of the Stephens league, which at this point was identical with the south line. But whether the line was easy or difficult of ascertainment is not the question. At the time the line agreed on was made, the respective owners did not know where it was, and adopted the method of agreement to establish it. They desired to settle the question, and did so by agreement. A fence was built on the agreed line, as a common fence between the parties, as the line. They were competent to make the agreement; and whether it was the correct line or not is not material to the validity of the same. If the fact that the parties were mistaken in fixing the line could invalidate the agreement, no such agreements could ever stand, unless they designated the exact line. There was no fraud or misrepresentation by either party."

To the same effect numerous cases might be cited, including Grawunder v. Gotoskey (Tex.Civ.App.) 204 S.W. 705; Browning's Ex'x v. Atkinson, 46 Tex. 605, all holding that where there was doubt, and whether the parties were right or wrong in their belief that the line they established and agreed upon as the boundary of their land was precisely where it ought to be, the maintenance of such agreed line is encouraged and upheld.

Appellees insist that Townes and the Oil Company are entitled to recover under the statute of limitation of three years. We overrule this contention.

"The facts which give rise to a boundary dispute cannot, it seems, involve an issue as to the three years' statute. If the land in controversy is described by the claimant's deed, he has no need of the statute to perfect his title; and if it is not so described he can have had no color of title thereto,—so that his possession of the land can avail him nothing." 2 Tex.Jur. pp. 283, 285. See, also, Bunnell v. Sugg (Tex.Civ.App.) 135 S.W. 701, 703; Wiley v. Lindley (Tex.Civ. App.) 56 S.W. 1001; Dutton v. Thompson, 85 Tex. 115, 19 S.W. 1026.

Numerous other questions are presented by the briefs which it is not necessary for us to discuss.

The judgment is, therefore, affirmed.